**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**KEVIN H. HUDSON,**

        **Plaintiff,**

-vs-                                              **Case No. 6:04-cv-892-Orl-31JGG**

**INTERNATIONAL COMPUTER**
**NEGOTIATIONS, INC.,**

        **Defendant.**

## ORDER

The Plaintiff, Kevin Hudson ("Hudson") filed this suit against his former employer, International Computer Negotiations, Inc. ("ICN"), asserting claims arising under the Employee Retirement and Income Security Act, 29 U.S.C. section 1001, *et seq.* ("ERISA"), the Florida Civil Rights Act, Florida Statute section 760, *et seq.* ("FCRA"), as well as a state law claim for negligent misrepresentation. This matter is before the Court on ICN's Motion for Summary Judgment (Doc. 49),[1] and Hudson's Response thereto (Doc. 66).[2]

**I.**     **Background**

A. Facts

Hudson, a resident of Ormond Beach, Florida, was employed by ICN from May 19, 1997 through November 12, 2002.[3] (Doc. 49 at 1, 4). When ICN hired Hudson, the parties entered into

---

[1] ICN's Memorandum in support of its Motion appears at Doc. 50.

[2] ICN also filed a Motion to Strike, (Docs. 68, 69), portions of Hudson's Response and Declaration, which the Court denied and instead has treated as a Reply to Hudson's Response. (*See* Doc. 70).

[3] ICN is a corporation conducting business in central Florida.

an employment agreement, which, *inter alia*, stated that Hudson was hired as an at-will employee. (Doc. 49 at 1-2; Doc. 51, Att. 1, Ex. A). Hudson was hired as the Director of CAUCUS,[4] which is an association of technology procurement professionals. (Doc. 51, Att. 1, Ex. A; Att. 2, Ex. B at 2). Hudson's compensation package included a base salary, eligibility for bonuses, participation in a 401K plan, paid vacation days, and health insurance. (Doc. 51, Att. 1, Ex. A). By the end of his employment, short term disability benefits, for which ICN paid the premiums, were available to Hudson, as was long term disability coverage, which was optional coverage for which Hudson had to pay. (Doc. 49 at 2; Doc. 52, Att. 2, Ex. G at 133).

During the fall of 2001, Joseph Auer III ("Auer"), ICN's president, became Hudson's direct supervisor. (Doc. 49 at 2; Doc. 51, Att. 2, Ex. B at 3). Auer began to notice that certain aspects of Hudson's work fell below his expectations. (Doc. 49 at 2; Doc. 51, Att. 2, Ex. B at 3). Auer took issue with several aspects of Hudson's performance, including: (1) Hudson's use of what Auer considered to be competitors of ICN to speak at CAUCUS functions despite Auer's instructions to the contrary; (2) Hudson's lack of knowledge regarding CAUCUS membership; (3) Hudson's management of communications with CAUCUS members; (4) Hudson's submission of improper claims for, and use of, comp time; and (5) Hudson's instruction that his assistant lie regarding a project on which she and Hudson were working.[5] (Doc. 51, Att. 2, Ex. B at 3-5). After Auer learned that Hudson had instructed his assistant to lie, Auer decided to terminate Hudson's

---

[4] Hudson was the only director, and no one at ICN had a position similar to his. (Doc. 52, Att. 2, Ex. G at 269).

[5] Bonnie Whitaker, Hudson's assistant, also states that Hudson instructed her to make false statements regarding communications with CAUCUS members. (Doc. 51, Att. 5, Ex. E at 2).

-2-

employment. (*Id*. at 4-5). However, Auer decided not to terminate Hudson's employment until after CAUCUS' Annual Conference, which Hudson had put together. (*Id*. at 5).

Auer has a "direct and no-nonsense management style," and he raises his voice in dealing with his employees when he is not pleased with their performance. (Doc. 51, Att. 2, Ex. B at 7; *see also* Doc. 51, Att. 6, Ex. F at 1 (stating that Auer "was extremely aggressive and confrontational towards ICN employees.")). As Auer became increasingly dissatisfied with Hudson's performance, their interactions became more contentious.[6] (Doc. 51, Att. 2, Ex. B at 7; Att. 6, Ex. F at 1). Hudson asked Auer several times if Auer wanted him to quit or if Auer was going to fire him, and Auer responded that Hudson was a valued team member and that Auer needed him.[7] (Doc. 52, Att. 2, Ex. G at 191, 192; *see also* Doc. 65, Att. 4 at 39). Auer would also occasionally comment that Hudson was doing a good job. (Doc. 52, Att. 2, Ex. G at 194).

On September 6, 2002, Auer witnessed Hudson leaving ICN's office, and asked where Hudson was going. (Doc. 51, Att. 2, Ex. B at 6; Doc. 52, Att. 2, Ex. G at 252-53). Hudson stated

---

[6] Hudson describes Auer as "abusive." (Doc. 52, Att. 2, Ex. G at 57). Hudson witnessed Auer yelling at other employees on multiple occasions. (Doc. 52, Att. 2, Ex. G at 161).

[7] These conversations form the basis for Hudson's negligent misrepresentation claim. (Doc. 52, Att. 2, Ex. G at 267). He did not, however, have the impression that he would have permanent employment with ICN or that ICN could not fire him. (*Id*.). Auer did not represent to Hudson that he would have a job at ICN forever, and Hudson knew that he was an at-will employee and could be terminated at any time. (*Id*. at 268). Further, Auer told Hudson several times not to do certain things or he would be fired. (Doc. 65, Att. 4 at 11). Auer does state, however, that he made the decision to terminate Hudson in October, but chose, for business reasons, to put off terminating him until after the CAUCUS Annual Conference. (*Id*. at 41). Thus, when Hudson asked Auer if Auer wanted Hudson to resign, even though that was after Auer made the decision to fire Hudson, Auer indicated that he did not want Hudson to resign. (*Id*.).

that he was seeing a psychologist and a psychiatrist for depression.[8] (*Id*.). Auer responded that he would be supportive. (Doc. 52, Att. 2, Ex. G at 253). Hudson did not tell Auer that his depression was work-related, nor did he state that he needed any accommodations from ICN. (Doc. 49 at 2; Doc. 51, Att. 2, Ex. B at 6).

Shortly thereafter, ICN hosted the CAUCUS Annual Conference. (Doc. 51, Att. 2, Ex. B at 6). Hudson was the ICN employee that was primarily responsible for organizing and managing that event. (*Id*.). Auer had several issues with Hudson's performance relating to the conference, which confirmed Auer's decision to terminate Hudson's employment. (*Id*. at 7).

On October 28, 2002, Hudson asked ICN's office manager, Deborah Rosenblum ("Rosenblum") for a copy of his long term disability insurance policy or for detailed information about long term disability benefits.[9] (Doc. 51, Att. 3, Ex. C at 2). On November 4, 2002, when Hudson still had not received the requested information, he again asked Rosenblum for the information. As with the first request, Rosenblum advised Hudson that she did not possess that sort of detailed information, and told him that he would have to make a direct inquiry to the insurance carrier. (Doc. 51, Att. 3, Ex. C at 2). Prior to Hudson's termination, Rosenblum did not tell Auer or ICN's Chief Financial Officer, Daniel Wallace ("Wallace"),[10] that Hudson had told her that he was receiving counseling and/or treatment for depression, nor did she tell them that Hudson

---

[8] Hudson is not aware of any other employee at ICN who suffered from depression. (Doc. 52, Att. 2, Ex. G at 269).

[9] Hudson does not know whether another ICN employee ever made a request to anyone at ICN regarding insurance benefits. (Doc. 52, Att. 2, Ex. G at 269).

[10] Hudson does not know if Rosenblum shared their discussions with Auer or Wallace. (Doc. 52, Att. 2, Ex. G at 255, 259-60). He only assumes that she did. (*Id*. at 255, 259-60, 265).

had made inquiries regarding disability insurance.[11] (Doc. 51, Att. 3, Ex. C at 3). On November 5, 2002, Hudson received a facsimile on his home fax machine, directly from the insurance carrier, containing a page from his long term disability policy regarding the mental illness provision.[12] (Doc. 52, Att. 2, Ex. 6, 260-62; Doc. 54, Att. 4, Ex. Q).

Auer terminated Hudson's employment on November 12, 2002, in a conversation outside of ICN's office.[13] (Doc. 51, Att. 2, Ex. B at 8). During that conversation, Auer gave several reasons for his decision, including: (1) problems with Hudson taking time off, such as granting himself paid days off without Auer's knowledge or consent; (2) taking advantage of the company; (3) using competitors in defiance of Auer's instructions; and (4) not knowing the membership retention rate. (*Id.*; *see also* Doc. 52, Att. 2, Ex. G at 197, 221, 231, 233).[14] Auer's decision was not based on Hudson's prior statement regarding his depression, and at the time he terminated Hudson, Auer was not aware that Hudson had made insurance-related inquiries. (Doc. 51, Att. 2, Ex. B at 8). Auer also states that he did not consider any benefits to which Hudson may have been entitled when he made the decision to terminate Hudson.[15] (*Id*. at 8-9).

---

[11] Hudson had made insurance-related inquiries to Wallace concerning employees under Hudson's supervision, but prior to Hudson's termination, Wallace had no knowledge that Hudson had made inquiries regarding his own insurance benefits. (Doc. 51, Att. 4, Ex. D at 2).

[12] There is no evidence that anyone at ICN received a copy of this fax, and Hudson did not give it to anyone at ICN. (Doc. 52, Att. 2, Ex. G at 261). Although Rosenblum requested the fax, there is no evidence that she told Auer about that request. (*Id*. at 263).

[13] Auer was solely responsible for Hudson's termination. (Doc. 51, Att. 2, Ex. B at 8).

[14] ICN's response to the Unemployment Compensation Commission lists several additional reasons, including: (1) Hudson instructed a subordinate to lie to Auer; and (2) Hudson's inability to meet key marketing deadlines. (Doc. 52, Att. 2, Ex. G at 221, 234).

[15] At no time after his termination did Hudson ever complain to anyone at ICN that he believed he was terminated because of a handicap or that his termination violated ERISA.

In July of 2003, ICN filed suit against Hudson seeking to enforce certain non-compete, confidentiality, and non-disclosure provisions contained in the employment agreement Hudson had signed with ICN. (Doc. 51, Att. 4, Ex. D at 4-5). In response, Hudson asserted that he had been wrongfully terminated because of a handicap. (*Id*. at 5; Doc. 51, Att. 4, Ex. D, ex. I thereto at 3). This was the first time Hudson had ever made any mention of such a claim to ICN. (*Id*.). Hudson subsequently filed suit against ICN.[16]

B. Claims and Arguments

In Count One, Hudson asserts that his termination was pretextual and done to purposefully interfere with his right to disability benefits under ICN's employee benefit plan in violation of ERISA. In Count Two, he brings a claim under FCRA, asserting that ICN's actions discriminated against him on the basis of a handicap. In Count Three, he asserts a claim for negligent misrepresentation, alleging that Auer's representations to Hudson that his position was secure were false, and that they were made to induce Hudson to organize the CAUCUS Annual Conference.

ICN has moved for summary judgment, arguing that Hudson cannot make out a prima facie case for a violation of either ERISA or FCRA, and that even if he could, ICN has articulated legitimate, non-discriminatory reasons for Hudson's termination. In addition, ICN argues that Hudson did not reasonably rely to his detriment on any statements by Auer regarding a guarantee of employment.

---

[16] Hudson also filed a charge of disability discrimination, citing depression as the grounds, with the Florida Civil Rights Commission on November 6, 2003. (Doc. 54, Att. 2, Ex. O).

**II.      Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[17]

---

[17] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

### III.   Legal Analysis[18]

A. Count One - ERISA

Section 501 of ERISA provides, in relevant part, that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title . . ., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140. "The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights. A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge. This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by" the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222-23 (11th Cir. 1993) (internal citations omitted).

---

[18] The Court addresses only Hudson's claims under ERISA and FCRA. In his Response, Hudson has conceded that the evidence does not support his negligent misrepresentation claim, and thus ICN is entitled to summary judgment on Count Three. (*See* Doc. 66 at 1-2).

To meet this burden by direct proof, a plaintiff must offer sufficient evidence to prove discrimination "without inference or presumption." *Id*. at 1223.  To meet this burden by circumstantial evidence, a plaintiff must show that: (1) he is entitled to protection under ERISA; (2) he was qualified for his position; and (3) he was "discharged under circumstances that give rise to an inference of discrimination." *Id*.  To satisfy the third element, a plaintiff does not have to prove discriminatory intent, but must offer evidence suggesting that interference with the plaintiff's ERISA rights was a motivating factor. *Id*. at 1223-24.  "The plaintiff, however, cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits." *Id*.

Hudson cannot satisfy the third element.  The best that he can do is offer his *assumption* that Rosenblum informed Auer of Hudson's request for information regarding long term benefits.  While an unsupported assumption is clearly insufficient to withstand a motion for summary judgment, Hudson's position is further weakened by evidence offered by ICN showing that Rosenblum did not inform anyone about Hudson's request, and that Auer was not aware of that request prior to Hudson's termination.  Because Hudson cannot establish that Auer, the sole decision-maker, was aware of Hudson's benefits inquiry, Hudson cannot establish that ERISA benefits were a motivating factor in his termination, and thus ICN is entitled to summary judgment on Count One.

B. Count Two - FCRA

To prove a prima facie case of disability discrimination under FCRA, a plaintiff must prove that he: "(1) has a disability; (2) is a qualified individual; and (3) was discriminated against because of the disability." *Goldsmith v. Jackson Mem'l Hosp. Pub. Health Trust*, 33 F. Supp. 2d

1336, 1339 (S.D. Fla. 1998). The Americans with Disabilities Act ("ADA") (which is used as a guideline for interpreting FCRA, inasmuch as FCRA is modeled after the ADA, *see Fouraker v. Publix Super Mkts., Inc.*, 959 F. Supp. 1504, 1510-11 (M.D. Fla. 1997)), defines "disability" as, with respect to an individual: "(A) a physical or mental impairment[19] that substantially limits one or more of the major life activities of such individual;[20] (B) a record of such an impairment;[21] or (C) being regarded as having such an impairment."[22] 42 U.S.C. § 12102(2).

---

[19] "Physical or mental impairment" means, *inter alia*, "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).

[20] "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Further, with respect to the "major life activity" of "working," "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3).

[21] "Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k).

[22] "Is regarded as having such an impairment" means:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or (3) Has none of the

Hudson asserts that he suffers from depression. Depression has been held to constitute a mental impairment, and thus may constitute a disability.[23] *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1132 (11th Cir. 1996). However, Hudson has offered no evidence to demonstrate that the depression from which he suffers substantially limits a major life activity, in particular, his ability to work,[24] nor has Hudson established either a record of impairment or that he was regarded as being impaired.[25] Indeed, the evidence is to the contrary, in that both prior to and after his termination, he engaged in a job search, and started his own company after his termination. (Doc.

---

impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).

[23] Assuming the depression substantially limits a major life activity. *Pritchard*, 92 F.3d at 1132.

[24] There is conflicting testimony regarding his state of depression. There is evidence that Hudson was not clinically depressed at the time of his termination. (*See* Doc. 53, Att. 2, Ex. I at 126). However, there is also evidence that he was suffering from "major depression" prior to his termination. (Doc. 65, Att. 5 at 16-17; *but see id*. at 31 (noting that Hudson's termination *caused* him to begin suffering from "full-blown symptomatic major depression")). Even so, there is no evidence that the fact that he suffered from major depression substantially limited his ability to work. It appears that, at present, Hudson is able to fully function in life. (Doc. 53, Att. 2, Ex. I at 122).

[25] In order to base a discrimination claim on a "record of impairment," a plaintiff "must show that he was classified or misclassified as having a mental or physical impairment that substantially limits one or more major life activities. Plaintiff must also prove that the employer was aware of the record in question." *Todd v. McCahan*, 158 F. Supp. 2d 1369, 1378 (N.D. Ga. 2000) (internal citations omitted). To base a claim on "being regarded as having an impairment," a plaintiff must show: (1) that the impairment is "substantially limiting and significant;" (2) that his employer viewed the impairment as "generally foreclosing the type of employment involved, not just a narrow range of job tasks;" and (3) more than mere knowledge on the part of his employer that he suffered from a certain condition. *Todd*, 158 F. Supp. 2d at 1379. Hudson has not only failed to establish that he has a disability, he failed to establish that Auer was aware of a record of substantial impairment or that Auer believed Hudson's depression foreclosed him from performing his job.

Case 6:04-cv-00892-GAP-UAM   Document 72   Filed 11/16/05   Page 12 of 12 PageID 1865

49 at 6; Doc. 52, Att. 2, Ex. G at 120). Accordingly, Hudson has failed to support his claim under FCRA, and ICN is entitled to summary judgment on Count Two. *See Crawford v. AT & T*, 177 F. Supp. 2d 1293, 1300 (N.D. Ga. 2000).

## IV. Conclusion

Hudson has utterly failed to support his claims under both ERISA and FCRA. Particularly given the circumstances of this case and the timing of this suit, it appears that this suit is little more than a retaliatory action by Hudson in response to ICN's suit regarding the non-compete agreement. Indeed, these circumstances, combined with Hudson's utter inability to support his claims make his claims appear little more than frivolous. Accordingly, it is

**ORDERED THAT** ICN's Motion for Summary Judgment (Doc. 49) is GRANTED. This case is removed from the February 6, 2006 trial docket, and the Clerk is directed to close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 16, 2005.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party