UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KEVIN H. HUDSON,

    Plaintiff,

    vs.                                CASE NO.  6:04-cv-892-Orl-31JGG

INTERNATIONAL COMPUTER
NEGOTIATIONS, INC.,

    Defendant.

_____/

### BASYLE TCHIVIDJIAN, ESQUIRE AND
### LANDIS GRAHAM FRENCH, P.A.'S
### TRIAL BRIEF

    Counsel for the Plaintiff, Basyle Tchividjian, Esquire, and Landis Graham French, P.A.

(collectively "Landis"), hereby file this their Trial Brief for the Honorable Court's consideration

in the hearing on whether to impose sanctions on counsel of record in this matter.

### I.    FACTUAL AND PROCEDURAL HISTORY

    1.    Plaintiff Kevin H. Hudson ("Hudson") filed this action against International

Computer Negotiations, Inc. ("ICN"), asserting claims arising under the Employee Retirement

and Income Security Act, 29 U.S.C. Section 1000 *et seq.* ("ERISA"), the Florida Civil Rights

Act, Chapters 760 through 765, Florida Statutes ("FCRA"), and a common law claim of

negligent misrepresentation.[1]

_____

[1]    ICN's assertion that Landis "switched legal theories when backed into a corner" is
undoubtedly based upon the fact that in the Plaintiff's Memorandum of Law in Opposition to
Defendant's Motion for Summary Judgment, Landis conceded that summary judgment was
proper on the common law negligent misrepresentation claim.  (Doc. No. 66).  Yet, Landis made
this concession because they found that the record did not support this claim, and they did not
want to argue a position that they knew was unfounded.  In other words, they brought to the

2.      On November 16, 2005, this Court entered an Order granting ICN's motion for summary judgment.  (Doc. No. 72).  The plaintiff took a timely appeal.

3.      On April 28, 2006, the United States Court of Appeals for the Eleventh Circuit affirmed this Court's Order granting ICN's motion for summary judgment.  (Doc. No. 112).

4.      On June 16, 2006, ICN moved for attorney's fees against Hudson, his trial counsel, and his appellate counsel pursuant to 29 U.S.C. Section 1132(g)(1); section 760.11(5), Florida Statutes; and 28 U.S.C. Section 1927.  (Doc. No. 114).

5.      In section IV of the accompanying Memorandum of Law in Support of its Motion, ICN urges this Court to award attorney's fees to ICN from Landis because ICN asserts that Landis helped Hudson bring this case for the sole purpose of retaliating against Joseph Auer, III ("Auer"), President of ICN, for his alleged verbal abuse of Hudson, for his termination of Hudson's employment, and for ICN's suit against Hudson in state court.  (Doc. No. 115-1).

## II.      ARGUMENT

A.      Suit Was Not Brought For Retaliatory Reasons

ICN argues that this Court should award attorney's fees to ICN from Landis because this suit was frivolous, Landis and Hudson knew that this suit was frivolous, and yet they brought this suit for the sole purpose of retaliating against Auer for filing a lawsuit against Hudson in state court.  ICN's argument fails because the facts belie ICN's theory.

---

Court's attention the unfavorable evidence in the record so as not to mislead the Court.  Contrary to ICN's assertions, Landis' conduct was commendable, not dishonorable.  If this Court were to find any basis to award attorney's fees to ICN, it would have to be on this claim under its inherent powers, though this Court should give due consideration to the fact that Landis dropped the claim when it was no longer viable.  *See Quintana v. Jenne*, 414 F.3d 1306, 1311-12 (11th Cir. 2005) (affirming a district court's award of attorney's fees for defending against a claim held to be frivolous but reversing the award with respect to another non-frivolous claim).

Landis accepted Hudson's representation on a contingency fee basis.  If Landis truly conspired with Hudson to bring this case for the sole purpose of retaliating against Auer, then it would not be logical for Landis to agree to represent Hudson on such a basis.  Rather, common sense dictates that Landis would seek a large retainer up front and have Hudson sign a fee-based contract, since the likelihood of obtaining a judgment against ICN would be minimal.  Furthermore, when the complaint was filed in this Court on June 10, 2004, the state proceedings were favorable to Hudson.  In fact, Circuit Judge Renee Roche entered an order denying ICN's Motion for a Temporary Injunction on October 20, 2003, eight months prior to the filing of complaint in the instant case.

ICN points to Landis' delay in filing the federal lawsuit as further evidence that it was retaliatory.  The reason for the delay in filing the instant case was because Hudson filed a charge of discrimination with the Florida Commission on Human Relations pursuant to the FCRA on November 6, 2003, and had to wait 180 days to file.[2]

Landis brought this case because it believed Hudson had been discriminated against and fired because of his disability, wanted to help him recover the damages to which it determined he was entitled, and felt that the record supported the ERISA, FCRA and negligent misrepresentation claims.  There was no ulterior motive as ICN has alleged.

B.    Landis Had A Reasonable Basis For The Claims

"In determining whether a suit is frivolous, 'a district court must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful.'"  *Sullivan v. School Bd. Of Pinellas County,* 773 F.2d 1182, 1189 (11th Cir. 1985) (quoting *Jones v. Texas Tech Univ.,* 656 F.2d 1137, 1145

---

[2]    This issue is discussed in depth later in this brief.

(5th Cir. 1981)).  "No matter how honest one's belief that he has been the victim of discrimination . . ., the course of litigation is rarely predictable. . . .  Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit."  *Christiansburg Garment Co. v. Equal Employment Opportunity Commission,* 434 U.S. 412, 422 (1978).  Viewing the record in this case (not with hindsight), it is quite clear that there was a reasonable basis for Landis to bring this suit.

Hudson was employed by ICN for five and one-half years.  (Doc. No. 1 at ¶ 10).  He was hired to fill the position of director of CAUCUS, an association of technology procurement professionals totaling nearly 1900 members.  (Doc. No. 51-3 at ¶ 2-3).  Auer conceded that Hudson had done generally acceptable work for CAUCUS and ICN over these five and one-half years.  (Doc. No. 51-3 at ¶ 4).  Furthermore, during the course of his employment with ICN, Hudson's compensation was increased numerous times.  (Doc. No. 11 at ¶ 12).  He received these annual raises during the course of his employment partly to recognize his years of service and partly because it was ICN's policy to give raises to employees who met the minimum performance standards.  (Doc. No. 51-3 at ¶ 9).

ICN did not have any formalized employee review procedures in place, so there was no documented evidence showing that Hudson had done anything wrongful during his employment with ICN.  (Doc. No. 50 at p. 9).  In fact, ICN's only documented, adverse, employment action against Hudson was the termination itself.  (Doc. No. 50 at p. 9, n.4).

Because Auer planned to take an extended absence from ICN, in August of 2002, just prior to Hudson's termination, Auer created an Executive Committee to run ICN as a group.  He handpicked Hudson to serve on this Committee.  (Doc. No. 51-3 at ¶ 9).  In recognition of the

substantial and additional job duties, Hudson and the rest of the Committee members received raises. (Doc. No. 51-3 at ¶ 9).

In September of 2002, Auer saw Hudson departing from ICN during work hours. Because he had noted that Hudson had been leaving the office from time to time during the work day, Auer asked Hudson where he was going. (Doc. No. 51-3 at ¶ 10). Hudson told Auer that he was seeing a psychiatrist and a counselor for depression. (Doc. No. 51-3 at ¶ 10). Shortly thereafter, in October of 2002, Auer decided to terminate Hudson's employment but waited until after the CAUCUS' Annual Conference in New Orleans, Louisiana was concluded. (Doc. No. 51-3 at ¶ 7). During this time, Auer began to target Hudson with verbal abuse, often in front of other employees and often with the use of profanity. (Doc. No. 51-7 at ¶ 9).

At the end of October, 2002, the CAUCUS Annual Conference took place. In Auer's own view, this Conference was a "tremendous responsibility" and "went well overall and certainly Hudson put lots of work into it." (Doc. No. 51-3 at ¶ 11-12). As one former ICN employee, Laura Proctor ("Proctor"), later noted in her affidavit, "Kevin Hudson was the only person that could keep the Caucus members happy and was effective at discouraging them from resigning their membership as a result of their treatment by Joe Auer. In fact, Caucus membership actually increased during the time Kevin Hudson was its director."[3] (Doc. No. 51-7 at ¶ 10).

Shortly after the CAUCUS Annual Conference was concluded, on November 5, 2002, Hudson asked for and received information regarding his disability benefits. (Doc. No. 52-3 at

---

[3]     In his deposition, Auer stated that Proctor was a former ICN administrator who had worked at ICN with her husband and with Hudson and who left ICN with her husband on good terms. (Doc. No. 65-4 at p. 170, ln. 9 – 16). Consequently, of the affidavits submitted in the case, her affidavit would presumably be the least affected by bias, since she no longer worked for Auer, for ICN, or with Hudson.

p. 259, ln. 4-6).  In direct response to his inquiry, ICN's Office Manager, Ms. Deborah

Rosenblum ("Rosenblum"), told him that although she had no detailed information as to what

ICN's insurance covered, she did know that ICN offered short-term disability coverage that was

paid for by ICN and long-term disability coverage, which was optional and paid for by the

employee and not ICN.  (Doc. No. 51-4 at ¶ 4).  Because he was on the road, Hudson did not

return to the office until November 12, *i.e.,* the day he was fired.  (Doc. No. 52-3 at p. 259, ln. 7-

9).

On November 21, 2002, Hudson met with Landis for an initial consultation at their office

in DeLand, Florida.  (Doc. No. 105-2 at ¶ 4).  While the substance of that meeting involved

unemployment benefits, Landis came to learn that Hudson had been terminated by Auer shortly

after requesting information from Rosenblum regarding ICN's disability benefits.  (Doc. No.

105-2 at ¶ 4); (Doc. No. 52-3 at p. 259, ln. 4-6); (Doc. No. 51-4 at ¶ 4).

Based upon a review of all of this evidence, *supra,* in conjunction with Hudson's

representations,[4] Landis reached the conclusion that Hudson was a competent employee who had

excelled in his position as Director of CAUCUS for ICN and that he was terminated because he

was seeking professional help for depression and had inquired about using ICN's disability

benefits.  Accordingly, within one year of Hudson's termination as allowed by Florida law, in the

Fall of 2003, Landis filed a complaint with the Florida Commission on Human Relations

(FCHR).[5]  (Doc. No. 105-2 at ¶ 7).  After 180 days expired Hudson sought a "right to sue" letter

---

[4]     At this time, Landis did not have the benefit of Proctor's information (as later detailed in her affidavit).

[5]     *See* § 760.11(1), Fla. Stat. (2003) ("Any person aggrieved by a violation of ss. 760.01-760.10 may file a complaint with the commission within 365 days of the alleged violation, naming the employer, employment agency, labor organization, or joint labor-management committee, or, in the case of an alleged violation of s. 760.10(5), the person responsible for the violation and describing the violation.")

from the FCHR.  Once the letter was received and after deciding it had reasonable cause, Landis filed the instant case.  *See* § 760.11(8), Fla. Stat. (2003) ("In the event that the commission fails to conciliate or determine whether there is reasonable cause on any complaint under this section within 180 days of the filing of the complaint, an aggrieved person may proceed under subsection (4),[6] as if the commission determined that there was reasonable cause.") (footnote added).

Hudson's complaint included, in addition to the FCRA claim, a claim under ERISA and a common law claim of negligent misrepresentation.  The ERISA claim was brought under 29 U.S.C. § 1140.[7] Therein, Hudson alleged that Auer, as President of ICN, had illegally discharged Hudson, and such discharge was done pretextually and with the purpose of interfering with the continuing rights to which Hudson was entitled under ICN's employee benefit plan.  (Doc. No. 1 at ¶ 1).

Hudson's case hinged upon proving the inference that Rosenblum had communicated his November 5th inquiry regarding disability benefits to Auer (the "inquiry").  Though this inference was never established by direct evidence, Landis had reason to believe that a jury could

---

[6]    *See* § 760.11(4), Fla. Stat. (2003) ("In the event that the commission determines that there is reasonable cause to believe that a discriminatory practice has occurred in violation of the Florida Civil Rights Act of 1992, the aggrieved person may either: (a) Bring a civil action against the person named in the complaint in any court of competent jurisdiction[.]").

[7]    *See* 29 U.S.C. § 1140 ("It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.").

find that Auer knew about the inquiry.  Landis believed that the causal connection could be

established by circumstantial evidence.   Its thought process was as follows:

1.      Rosenblum works directly for Auer as his assistant.  It is wholly unlikely

that she would not inform him that one of the directors of the company, *i.e.*, Hudson, was

inquiring about long-term disability benefits.  At the time the inquiry was made, Hudson ran

CAUCUS, CAUCUS was the most profitable division of ICN, and Auer was about to take an

extended leave of absence from ICN.  (Doc. No. 105-6 at p. 5, ln. 2 – 20).  Proctor's affidavit

further supports Hudson's belief.

> Everyone in the office knew that Debbie's primary role at ICN was
> to keep Joe Auer informed about what was going on in the office
> and to take care of some of Joe Auer's non ICN related business.
> Based upon prior experiences, we were all aware that whatever
> was shared with Debbie Rosenblum would be subsequently
> communicated to Joe Auer.  There is no doubt that Debbie
> Rosenblum would have told Joe Auer that Kevin Hudson was
> seeking information on both short and long term disability.

(Doc. No. 51-7 at ¶ 12).

2.      Second, there were several inconsistencies on how Wallace had been

informed of the inquiry.  Hudson stated in his deposition that he only made the inquiry to

Rosenblum.  (Doc. No. 52-3 at p. 255, ln. 4 – p. 256, ln. 19).  Rosenblum stated that she neither

assists Wallace in any way nor confers with him ever regarding employee benefit inquiries.

(Doc. No. 105-6 at p. 5, ln. 21 -22; p. 8, ln. 25 – p. 9, ln. 5).  When asked, "Do you have any idea

of how Dan Wallace would have known or could have known about Kevin Hudson's inquiry to

you about disability information?" she replied, "No.  He certainly didn't hear it from me."  (Doc.

No. 105-6, at p. 33, ln. 15 – 19).  Yet, Wallace knew about the inquiry.  How could that be?

Wallace was inconsistent when telling how he learned of the inquiry.  On June 6, 2005, in

his deposition, the following exchange took place:

Q.     How did you learn about his inquiry concerning disability insurance?

A.     He may have asked me.

Q.     Well, again you've answered with a may.  As you sit here today, do you know how you learned - -

A.     As I sit here today, I don't know how I learned it.

Q.     Is it possible you could have learned from Debbie Rosenblum?

A.     I may have learned from Debbie Rosenblum.

(Doc. No. 56-6 at p. 83, ln. 8 – 17).  Three months later on September 23, 2005, Wallace in his affidavit, stated: "No one at ICN ever communicated with me prior to Hudson's termination that he had made any insurance-related inquiries about himself or that he was undergoing counseling or had depression or was being treated for depression."  (Doc. No. 55-4 at ¶ 4).

3.     Further inconsistencies in Rosenblum's, Wallace's and Auer's versions of Hudson's termination led Landis to believe that one or more of them may not be found credible by a jury.  For instance, in initially stating the reasons given for Hudson's termination, Auer gave four responses: "taking time off"; "taking advantage of the company"; "using competitors"; "not knowing the membership retention rate."  (Doc. No. 55-4 at Exhibit "A").  Wallace admitted that subsequent to that initial response, Auer and he engaged in a "collaborative effort" to draft a response to the Unemployment Appeals Commission, coming up with twelve reasons for Hudson's termination.  (Doc. No. 56-6 at p. 34, ln. 20 – p. 35, ln. 1).  From this evidence, Landis believed a jury could infer that ICN had manufactured reasons for Hudson's termination after the termination itself.  This belief was bolstered by other circumstantial evidence.  For example, Wallace admitted that even though he wrote in response to the Unemployment Appeals Commission that Hudson would take off a whole day for just a one-hour doctor's appointment as

one of the twelve reasons for Hudson's termination, he did not know anything about this

assertion, despite the fact that he is both CFO and head of human resources at ICN, until he was

told by Auer himself prior to preparing ICN's answer.  (Doc. No. 56-6 at p. 49, ln. 14 – 25).

Landis' belief was also bolstered by Auer's admission that despite all of Hudson's alleged

shortcomings as an employee, he still appointed him to ICN's Executive Committee:

> Q.     So Kevin Hudson, the guy that was under performing,
> according to you, the guy that's unable to keep information to you
> about retention rates, the guy that's involved in a comp time scam
> according to you, the guy that's allegedly telling a subordinate - -
> to be untruthful.
>
> All these things, this person, you elevated to a committee of
> three or four, excuse me, me [sic] that was going to run the
> company and gave this person a raise; is that true?
>
> MR FENDER:          Object to form.
>
> Q.     Is that true?
>
> A.     That's true.
>                . . . .
>
> Q.     So, the person who you say could have been fired
> repeatedly, you actually promote and give a raise to?
>
> A.     I wouldn't say it was a promotion.  It was not regarded as a
> promotion.
>
> Q.     Well, he got an increase in salary, did he not?
>
> A.     Yeah.  Does that always go with a promotion?

(Doc. No. 65-4 at p. 145, ln. 8 – 20; p. 146, ln. 19 – 25).

Among one of the twelve reasons for Hudson's termination, Wallace and Auer alleged

that Hudson had a number of inexcusable absences from work.  (Doc. No. 55-4, page 3 – 4 of

Exhibit "B").  Yet, Auer admitted in his deposition that Rosenblum handled all of the employees'

scheduled absences from work, though he stated that he had asked her on many occasions why

Hudson was not at work, expressing concern for his continued absences.  (Doc. No. 65-3 at p.

94, ln. 9 – p. 95, ln. 1).  However, when Rosenblum was asked whether she had ever heard of

Hudson having inexcusable absences from work prior to commencement of the instant litigation,

she affirmatively answered, "No," and even agreed that he was a reliable employee who came to

work when he was not out of town for CAUCUS matters or out for acceptable and excusable

reasons, *i.e.*, illness, vacation or comp time.  (Doc. No. 105-6 at p. 24, ln. 18 – p. 25, ln. 3).

Landis' belief was further bolstered by Proctor's affidavit which provided the following:

> Sometime after Kevin Hudson's termination from employment, I
> was approached by Joe Auer and asked to testify in a hearing.
> During that conversation, Joe Auer trashed Kevin Hudson and his
> work performance.  I found that Joe Auer's comments regarding
> Kevin Hudson's poor work performance were inaccurate and
> unfounded.  In fact, this was the first time I had ever heard Joe
> Auer make any complaints about the issues he raised during that
> conversation.

(Doc. No. 51-7 at ¶ 13).

Viewing all of these facts as a whole, Landis came to the reasonable conclusion that there

were too many inconsistencies in Rosenblum's, Wallace's, and Auer's stories to believe them.

There was circumstantial evidence that could lead a reasonable person to conclude that Auer

terminated Hudson because he feared that Hudson would utilize the disability benefits and take

an extended leave of absence from his company at a critical time (*i.e.*, when he planned to take a

sabbatical), leaving no one to run CAUCUS.  As Auer stated: "I didn't want him [Hudson] to

resign. . . .  If he is going to leave the company, I want it to be a time of my choosing, rather than

his and I think that is a business decision that a lot of executives make."  (Doc. No. 65-4 at p.

159, ln. 6; ln. 21 – 24).

Landis did not believe that Hudson's case was frivolous.  ICN never informed Landis

orally, in writing, or through any court filing prior to the instant motion for attorney's fees, that it

thought this case was frivolous, unreasonable, vexatious, or without foundation.  In addition,

ICN never informed Landis prior to the instant motion for attorney's fees that it thought the

claims in the instant lawsuit were being pursued vexatiously, unreasonably, or in bad faith.

C.      28 U.S.C. § 1927

        "Any attorney or other person admitted to conduct cases in any court of the United States

or any Territory thereof who so multiplies the proceedings in any case unreasonably and

vexatiously may be required by the court to satisfy personally the excess costs, expenses, and

attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.  "The plain

statutory language of section 1927 makes clear that this section is not a 'catch-all' provision for

sanctioning objectionable conduct by counsel."  *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220,

1225 (11th Cir. 2003).  "[T]he provisions of § 1927, being penal in nature, must be strictly

construed."  *Peterson v. BMI Refractories*, 124 F.3d 1386, 1395 (11th Cir. 1997).  "Something

more than a lack of merit is required for § 1927 sanctions or they would be due in every case."

*McMahan v. Toto*, 256 F.3d 1120, 1129 (11th Cir. 2001).  "A court may assess attorney's fees

against litigants, counsel, and law firms who willfully abuse judicial process by conduct

tantamount to bad faith."  *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991) (citing

*Roadway Express Inc. v. Piper*, 447 U.S. 752 (1980)).

        The Eleventh Circuit has recently interpreted § 1927 and provided the following guidance

for this Court:

> We have consistently held that an attorney multiplies
> proceedings "unreasonably and vexatiously" within the meaning of
> the statute only when the attorney's conduct is so egregious that it
> is "tantamount to bad faith."
>
> . . . .
>
> But it is clear from the statutory language and the case law that for
> purposes of § 1927, bad faith turns not on the attorney's subjective
> intent, but on the attorney's objective conduct.   The term

"unreasonably" necessarily connotes that the district court must compare the attorney's conduct against the conduct of a "reasonable" attorney and make a judgment about whether the conduct was acceptable according to some objective standard. The term "vexatiously" similarly requires an evaluation of the attorney's objective conduct.

. . . .

In short, a district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings. That is not to say the attorney's purpose or intent is irrelevant. Although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus, because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be "unreasonabl[e] and vexatious []" if it is done with a malicious purpose or intent.

It is also, by now, clear that negligent conduct, standing alone, will not support a finding of bad faith under § 1927-that is, an attorney's conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney.

. . . .

Thus, an attorney's conduct must be particularly egregious to warrant the imposition of sanctions-*the attorney must knowingly or recklessly pursue a frivolous claim* or needlessly obstruct the litigation of a non-frivolous claim. If the attorney's misconduct meets this high standard, the district court may order the attorney to pay the "costs, expenses, and attorney's fees reasonably incurred" because of the attorney's misconduct-that is, the excess costs that the attorney's multiplication of proceedings has added to the cost of the litigation.

*Amlong & Amlong, P.A. v. Denny's, Inc.*, No. 04-14499, 2006 WL 2105980, at *7-9 (11th Cir.

July 31, 2006) (emphasis in original) (emphasis added).

In light of all of the foregoing, section 1927 sanctions are inappropriate in the instant

case. "Section 1927 requires bad faith, which is more than negligence or lack of merit. This

court has held that an attorney who 'knowingly or recklessly pursues a frivolous claim' acts in

bad faith." *Smith v. Grand Bank & Trust of Florida*, No. 04-80343-CV-DTKH, 2006 WL

2034809 at *4 (11th Cir. July 20, 2006).   As noted above, Landis' ERISA and FCRA claims

13

were not frivolous because they were neither groundless nor without foundation. *See, Sullivan*, 773 F.2d at 1189. Consequently, section 1927 sanctions should not be awarded.

This case is virtually identical to *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169 (11th Cir. 2005). In that case, an employee of Dillard's who was undergoing treatment for a heart condition admitted in her manager's office that she hated working there, and as a consequence of that admission, her manager, Kathy Groo, fired her on the spot. *Id.* at 1173. Groo testified that at the time of the termination, she was completely unaware of Cordoba's heart condition. Id. at 1174. Thereafter, Cordoba brought suit, asserting claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and the FCRA. *Id.* at 1171. Because Cordoba could never establish that Groo was aware of her disability prior to her termination, the court granted summary judgment, and the Eleventh Circuit affirmed on appeal. *Id*. at 1174-75.

Dillard's then sought, *inter alia*, § 1927 sanctions against her counsel. The district court granted the motion and referred the matter to a magistrate judge for a determination as to the amount of fees and expenses Dillard's was entitled. *Id.* at 1176. Because the magistrate judge found that Groo's lack of knowledge of Cordoba's disability should have been apparent after Groo's deposition was completed, it recommended, *inter alia*, an award of $191,339.95 in fees and costs to be paid by Cordoba's counsel, and the district court adopted the magistrate's report in its entirety. *Id.* at 1179.

In finding that the district court abused its discretion and reversing the entire award of fees and expenses, the Eleventh Circuit noted that Dillard's failure to move for summary judgment at an early stage of the proceedings bolstered its conclusion that Cordoba's claims were not frivolous. *Id.* at 1188 ("If Dillard's thought that this deficiency in Cordoba's case was as glaring as the district court later concluded, one would have expected Dillard's to schedule any

necessary depositions promptly and then move for summary judgment on this ground at an early stage of the proceedings.").

Similarly, in the instant case, ICN claims that Auer was never aware of Hudson's alleged disability.  In fact, because Landis and Hudson could never establish that Rosenblum informed Auer of Hudson's alleged disability, this Court granted ICN's motion for summary judgment.  Yet, ICN never moved for summary judgment until all of the discovery had occurred.  If this case were truly frivolous, as ICN asserts, one would expect that it would have taken Hudson's deposition promptly and then moved for summary judgment at an early stage of the proceedings.

*Grand Bank supra* is also instructive.  In that case, Smith, a teller at Grand Bank & Trust of Florida ("Grand Bank"), was diagnosed with breast cancer and applied for, and received, leave time under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601.  *Grand Bank*, 2006 WL 2034809, at *1.  After she returned from her leave, Grand Bank attempted numerous times to accommodate Smith's varying requests, such as offering her the same salary and benefits as she received when working full-time for a part-time position, paying her for two weeks worth of work after she refused another position even though she did not work at all, and extending leave and insurance coverage to her until her leave expired.  After her leave expired, Grand Bank attempted numerous times to reach Smith, but she never contacted Grand Bank.  Consequently, Grand Bank terminated her employment, and she brought suit against them.

The complaint was soon dismissed with prejudice, and a hearing was held on § 1927 sanctions against Smith's counsel, Scott Behren, before a magistrate judge.  *Id.* at *2.  The magistrate judge recommended that sanctions be granted against both Behren and his former law firm, jointly and severally.  After Behren and his former law firm objected to the magistrate's report and recommendation, the district court conducted a *de novo* review and rejected the

magistrate's recommendation, "noting that sanctions were permissible but not required, and finding that the conduct did not rise to the level of willful abuse and bad faith." In affirming the district court, the Eleventh Circuit held as follows: "[W]e note the *unnecessarily contentious* nature of this litigation, and we do not condone the parties' behavior in this case. In fact, it appears that the parties' *extreme adversarial conduct* has contributed to the legal fees incurred. Nevertheless, in light of the record, we cannot conclude that the court abused its discretion in denying sanctions." *Id.* at *5 (emphasis added).

If the Eleventh Circuit refused to award § 1927 sanctions in a case such as *Grand Bank* where it even noted that plaintiff's counsel engaged in "unnecessarily contentious" litigation and "extreme adversarial conduct", then such sanctions are inappropriate here.

D.    FCRA

The FCRA provides as follows: "In any action or proceeding under this subsection, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs. It is the intent of the Legislature that this provision for attorney's fees be interpreted in a manner consistent with federal case law involving a Title VII action." § 760.11(5), Fla. Stat. (2005). "The Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387 (11th Cir. 1998).

The seminal case on attorney's fees awards in the context of Title VII actions is *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412 (1978). In that case, the United States Supreme Court held as follows:

> In sum, a district court may in its discretion award attorney's fees
> to a prevailing party defendant in a Title VII *case upon a finding*

16

*that the plaintiff's action was frivolous, unreasonable, or without foundation*, even though not brought in subjective bad faith.

In applying these criteria, *it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.* . . .

To take the further step of assessing attorney's fees against plaintiffs simply because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII. Hence, *a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so.* And, needless to say, if a plaintiff is found to have brought or continued such a claim in *bad faith*, there will be an even stronger basis for charging him with the attorney's fees incurred by the defense.

434 U.S. at 421-22 (emphasis added).

In view of the facts and arguments laid out above, Hudson's claims were not frivolous, unreasonable or groundless. In fact, as previously stated, ICN never made these assertions until the instant motion for attorney's fees. Simply put, because Landis did not have any direct evidence that Auer terminated Hudson's employment based upon discrimination due to Hudson's alleged disability, it asserted its case based on circumstantial evidence. Such practice is common in discrimination suits. *See Tillman v. City of Ocala*, No. 504CV219OC10GRJ, 2005 WL 2346951, at *6-7 (M.D. Fla. Sept. 26, 2005) ("[I]n a Title VII action, the Plaintiff bears the

burden of proving his prima facie case, by way of direct, statistical, or circumstantial evidence. In the absence of either direct or statistical evidence of discrimination, a Plaintiff must rely on circumstantial evidence in order to establish his prima facie case.").

"In determining whether to assess attorney's fees, the district court must examine (1) whether the plaintiff established a prima facie case, (2) whether the defendant offered to settle, and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Turner v. Sungard Business Systems, Inc.,* 91 F.3d 1418, 1422 (11th Cir. 1996) (citing *Sullivan v. School Bd. of Pinellas County,* 773 F.2d at 1189 (11th Cir.1985)).  While Landis never established a *prima facie* case of discrimination and while this case was dismissed prior to trial, ICN never offered to settle at any point when Landis pursued Hudson's claims.  In fact, two different mediations were held between Hudson and ICN in both the state and federal proceedings.  The federal mediation was held on September 21, 2005; the state mediation was held on March 28, 2006.  In both, the respective mediators declared an impasse.  Yet, Landis offered to settle both proceedings by proposing that both ICN and Hudson walk away from both cases with each party bearing their own attorney's fees and costs.  This was a monumental concession since Landis represented Hudson on a contingency fee basis in the Federal case.[8]

The fact that ICN ultimately prevailed in its motion for summary judgment is irrelevant to the determination of whether ICN is entitled to attorney's fees.  "A defendant is not entitled to an award of attorney's fees and costs simply because it prevailed in summary judgment. . . . Congress did not intend-that any defendant who prevailed on a dispositive motion would be entitled to fees." *Boler v. Space Gateway Support Co., LLC,* 290 F. Supp. 2d 1272, 1280 (M.D.

---

[8]    *See Quintana,* 414 F.3d at 1310 ("We are unaware of any authority that would preclude us from considering a settlement offer made during mediation, but the amount of the offer is a necessary factor in evaluating whether a settlement offer militates against a determination of frivolity.")

Fla. 2003) (citation omitted).  In fact, under the Supreme Court's clear precedent on this issue,

this Court is prohibited from awarding fees on that basis.  *See Christiansburg Garment*, 434 U.S.

at 421-22.

E.      ERISA

Section 502(g) provides that "[i]n any action under this subchapter . . . by a participant,

beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and

costs of action to either party."  29 U.S.C. section 1132(g)(1).  "The law provides no

presumption in favor of granting attorney's fees to a prevailing party claimant in an ERISA

action."  *Freeman v. Continental Ins. Co.,* 996 F.2d 1116, 1119 (11th Cir. 1993).  "In sum, §

1132(g)(1) 'does not award fees to the prevailing party outright, but rather, allows for attorney's

fees for either party in accordance with the district court's discretion."  *Id.* at 1121 (quoting

*McKnight v. Southern Life and Health Ins. Co.,* 758 F. 2d 1566, 1572 (11th Cir. 1985)).

"This court has held that the following factors should be considered in determining

whether to award attorney's fees: (1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award

of attorney's fees against the opposing parties would deter other persons acting under similar

circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants

and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA

itself; (5) [and] the relative merits of the parties' positions."  *Wright v. Hanna Steel Corp.,* 270

F.3d 1336, 1344 (11th Cir. 2001) (citing *Freeman*, 996 F.2d at 1119).  "No one of these factors is

necessarily decisive, and some may not be apropos in a given case, but together they are the

nuclei of concerns that a court should address in applying section 502(g)."  *Iron Workers Local*

*No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980).  These factors are "merely guidelines

intended to aid courts in their analysis." *Plumbers and Steamfitters Local No. 150 Pension Fund v. Vertex Construction Co., Inc.*, 932 F.2d 1443, 1453 (11th Cir. 1991).

Landis does not dispute the second factor, and the fourth factor is not applicable.  Landis does allege as it has done earlier in its brief that it did not act in bad faith in bringing this case. In Landis' good faith opinion there was enough circumstantial evidence to establish a *prima facie* case.  This is supported by Landis' decision to take on Hudson's representation in this matter on a contingency.  Landis did not know that this Court considered the instant case lacking merit until its Order granting ICN's motion for summary judgment on November 16, 2005.  (Doc. No. 72). Furthermore, because Landis did not act in bad faith, an award of attorney's fees against it would not deter other persons acting under similar circumstances but to the contrary would discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. *Christiansburg,* 434 U.S. at 421-22.   To assess attorney's fees against plaintiff simply because it did not prevail would substantially add to the risks inhering in most litigation and would undercut the efforts of Congress to promote the vigorous enforcement of the provisions of Title VII. *Id.* at 421-22.

### III.   CONCLUSION

In sum, this Court should find that Landis did not bring the instant suit for retaliatory purposes, that Landis did not file a frivolous lawsuit, and that Landis did not unreasonably or vexatiously pursue a meritless claim.  Accordingly, there is no basis for granting ICN's motion for attorney's fees, and that motion should be denied.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 4th, 2006, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Craig L. Berman, Esq., Berman Law Firm, P.A., Plaza Tower, Suite 706, 111 2nd Ave., N.E., St. Petersburg, FL 33701; Victor Chapman, Esq., Barrett, Chapman & Ruta, 18 Wall St., Orlando, FL 32801 and George Steven Fender, Esq., Litchford & Christopher, P.A., 390 N. Orange Ave., Ste. 2200, P.O. Box 1549, Orlando, FL 32802-1549.

   /s/ Albert F. Tellechea
Albert F. Tellechea, Esq.
Florida Bar No. 0323675
albert.tellechea@hklaw.com
Andrew P. Lannon, Esq.
Florida Bar No. 0648140
andrew.lannon@hklaw.com
HOLLAND & KNIGHT LLP
200 S. Orange Avenue, Suite 2600
Orlando, Florida  32801
Telephone:  (407) 425-8500
Facsimile:  (407) 244-5288

Attorneys for Basyle Tchividjian, Esq. and
Landis Graham French, P.A.

# 3997366_v8